(No. 25947.—■■■■■■■)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ARCHIE LEONARD BOWEN, Plaintiff in Error.

*Opinion filed April 15, 1941.*

STONE & TAYLOR, HAROLD F. TRAPP, and JOHN A. MAYHEW, for plaintiff in error.

JOHN E. CASSIDY, Attorney General, SAMUEL H. SHAPIRO, State's Attorney, A. B. DENNIS, and VICTOR LAURIDSEN, for the People.

Mr. JUSTICE SHAW delivered the opinion of the court:

Archie Leonard Bowen, then director of the Department of Public Welfare of the State of Illinois, was indicted by a special grand jury in the circuit court of Kankakee county for the alleged violation of section 208 of the Criminal Code. (Ill. Rev. Stat. 1939, chap. 38, par. 449.) This act provides a penalty of a fine not exceeding $10,000 and removal from office for every person holding any public office, who shall be guilty of any palpable omission of duty, etc. It was charged that the plaintiff in error failed to take proper measures to render the drinking water at the Manteno State Hospital fit for drinking purposes and that, by reason thereof, an epidemic of typhoid fever occurred, resulting in many serious illnesses and deaths. The cause was first heard by a jury which failed to agree. The second trial was before the court without a jury and, by stipulation, was had upon a transcript of the same evidence which had been heard by the jury in the first trial. The court found the defendant guilty, imposed a fine of $1000 and removed him from his office as Director of the Department of Public Welfare, and that is the judgment reviewed by this writ of error.

The plaintiff in error makes a number of contentions, only one of which needs to be considered. He urges (1) that the evidence is insufficient to sustain the judgment, (2) that the statute under which he was indicted is unconstitutional, (3) that the venue was improperly laid in Kankakee county and (4) that the grand jury which indicted him was illegally selected. A consideration of the first point only disposes of the case.

It is to be noted at the very outset that Bowen is not a doctor, bacteriologist, nor any kind of a scientist, and that for such technical matters he was dependent upon the advice of the doctors in the Department of Public Health. He started in life as a newspaper man, having been born in 1869, and is now seventy-two years of age. From newspaper work he went into public charitable work and thereafter into supervising State charitable institutions, in which capacity he served under five Governors, namely, Dunne, Deneen, Lowden, Emmerson and Horner. He served the State of Illinois from 1909 to 1921 and again from 1929 until 1940. Since 1909, he has served under every Governor except Governor Small, and his original commission was obtained under the Civil Service law.

At the time of the unfortunate events at Manteno State Hospital, which are hereinafter set forth, Bowen's duties were very extensive. The Department of Public Welfare, of which he was in charge, had more than ten thousand employees under his direction and supervision and these, in turn, had direct supervision over the following State Institutions: Ten Insane Hospitals, with 32,000 patients, five penal institutions with 14,000 inmates, two institutions for juvenile research, two schools for technical education of the blind and deaf, three institutions for veterans, an infirmary in Chicago, treating 350,000 patients per year, five clinics for control of trachoma, treating 4000 to 5000 patients per year, a division of child welfare, the State Board of Pardons and Paroles, with supervision of all pa-

roled prisoners during their period of rehabilitation, and the division of old age assistance, caring for approximately 138,000 pensioners. Without any effort at a detailed state-ment of the entire record, it is apparent from a mere recital of the foregoing facts, that the Manteno State Hospital could not have been expected to receive more than a small portion of the time of the director and the appropriations for the department.

The first case of typhoid fever at the Manteno State Hospital occurred in July, 1939, which was approximately the period of incubation for the typhoid *bacillus,* after the admission of one Mary Ores, whose case will be noted later in this opinion. The next case was on or about August 15, 1939, and others followed swiftly thereafter until a total of 411 cases had developed. Nothing out of the ordinary, in the way of an epidemic, took place prior to August 15, 1939, at which time Bowen was taken rather desperately sick with a *streptococcus* infection, and, for several weeks and during the height of the epidemic, was so far disabled as to not know, except by hearsay, during part of the time, as to what the Department of Health was doing at the Manteno State Hospital.

It was the theory of the People that the epidemic was caused by pollution of the drinking water at the hospital, which came from four deep wells. The record indicates that the terrain at that place is underlaid with a creviced niagaran limestone, which is of such a character as to per-mit the sub-surface drainage of water to get through with-out being filtered. There were four wells, varying in depth from 227 feet to 1760 feet, and these were cased from the surface of the ground to varying depths. It is a further theory of the People that sewage escaped from the sewage disposal system of the hospital and, percolating through this creviced limestone, entered the various wells and thereby caused a pollution which brought about the epidemic of typhoid. It is contended that it was the defendant's duty

to have a chlorinating plant installed, or by some other means to have prevented this alleged contamination. In this connection, it is to be noted that it was neither alleged nor proved that the defendant had any authority to expend the necessary eight or ten thousand dollars for a chlorination plant, nor that the Department of Health of the State of Illinois had ever recommended it.

It appears from the record that the State Department of Health has laboratories at Springfield, which regularly, at approximately monthly intervals, examines samples of drinking water from the various State institutions, and that this department has a series of stock-form recommendations numbered from 1 to 14 which are stamped on the back of the reports sent to the various institutions. These analyses of drinking water are made by chemists or bacteriologists and not by doctors nor by any one qualified to express any medical opinion. It seems that the routine procedure is for the examiner, who is sometimes a recently graduated chemical student, to note form number so and so to be stamped on the back of the report, which is done accordingly. Some of these forms say "the above analyses shows that the water is contaminated at the time samples were taken and was not entirely safe for drinking purposes." Other forms are "the above result shows that the water at the time of sampling was safe to drink. The continued safety of the supply is not assumed, however. See previous reports and correspondence." The court admitted in evidence about 158 of these periodic reports, ranging in time from March, 1931, to October, 1938, and ranging in results from a statement of contamination in some of them to a statement in the latest of them that the water was safe for drinking purposes. There is no report of any examination within seven or eight months of the outbreak of this epidemic.

It is fully apparent from the record that no microscopic examination was ever made for the presence of typhoid

*bacillus* and there is no evidence to indicate that typhoid *bacillus* was ever mentioned to the defendant until after the outbreak of this epidemic. The recommendations and opinions written or stamped on these reports were clearly not admissible in evidence for a number of reasons: They did not show who made the examination, they did not show that the person who made the examination was qualified to make any recommendation and they constituted merely a voluntary comment by an unqualified person not present to testify in person nor subject to cross-examination. The most that can be said for any of these 158 exhibits, is that it showed the water to be either positive or negative as to *coli aerogenes*.

It appears from the record that *coli aerogenes* or *colon bacillus* may be friendly or inimical, and that the mere presence of the *colon bacillus* in water proves exactly nothing so far as typhoid fever is concerned. The tests seem to have been made by a method of broth fermentation, and determined nothing more than the presence or absence of some kind of *colon bacillus*. It further appears that this type of *bacillus* is present in the air one breathes, in milk, on fruits and practically everywhere.

It is further apparent that *colon bacillus* may be of the fecal or non-fecal type and that so far as typhoid is concerned, it is only the fecal type from man alone (not from animals) that can spread the disease. The typhoid *bacillus* could not possibly have been identified by the laboratory means used in any of these reports and none of them is of any value to the People in an attempt to prove the guilt of the defendant. It should again be noted as above, that Bowen was not a doctor nor a bacteriologist, and that all of these reports passed through the hands of Dr. Andy Hall or Dr. Frank Jerka or Dr. Baxter in the Department of Health and that none of them either directly or indirectly ever mentioned typhoid to Bowen.

Even if these reports were of any probative value they would necessarily tend to disprove, rather than prove a case against the defendant. The water from these wells was consumed by all the inhabitants of Manteno for more than eight years prior to this epidemic. This test over a period of eight years, if looked upon as a laboratory experiment, would go a long way toward proving that the water actually was safe for human consumption, because there is no evidence of any abnormal condition as to typhoid occurring during that period of time. It is difficult to think of any better proof that could be offered that the water was free from typhoid *bacillus* and that the epidemic was not water-borne. The conclusion that it was not water-borne was also proved by an exceptionally well-qualified and experienced expert witness, who based his conclusion on the People's own exhibits. Still another reason for thinking that the epidemic was not water-borne is necessarily inferred from a total failure to prove that there existed any defect or leak in the sewage system.

The People offered the expert testimony of a young doctor employed by the Department of Public Health. This witness prepared a number of charts showing such essential points as the number of cases beginning on particular days during the epidemic, whether the afflicted person was an employee or patient, the age group of the various patients, their sex, whether or not they were food-handlers, the location of the patients within the numerous buildings, constituting the entire hospital, the number of cases in each separate building, with dates of incidents of the disease and other pertinent facts. This doctor was neither asked nor expressed any opinion as to whether the disease came from the water supply. The record discloses that at least ten qualified physicians in the employ of the Department of Public Health were at Manteno during the epidemic and not one of them was even asked by the People to ex-

press an opinion as to whether or not the epidemic had been caused by the drinking water. In fact, only two or three of them were called at all as witnesses, and one of these, Dr. Baxter, was later called by the defendant and testified that in his opinion the disease was not caused by the water. There is thus a total failure to prove, even by the opinion of experts, that the disease was caused by the drinking water as charged in the indictment.

At this point it is desirable to consider the case of Mary Ores, who has heretofore been mentioned in this opinion. This patient was admitted to the hospital June 12, 1939, which, according to the medical evidence, was about the normal period of incubation for typhoid *bacillus* before the first case of that disease occurred in the institution. She was so insane as to require feeding by tube through her nose, and refused to remain in bed, getting up continuously and roaming about the ward in which she was a patient. Physically, she was gross and filthy. She weighed approximately two hundred pounds, ran a constant temperature of from 99 to 103 degrees, suffered from a large carbuncle on her neck which required surgical treatment, and had an uncontrollable diarrhea, which she either did not or could not restrain. As a result, her person, clothes and her bed were constantly defiled with bodily excretions. At that time no one either had or could have diagnosed her case as typhoid, and she was, therefore, constantly and by the most virulent methods, exposing others in the ward, her nurses, attendants and those who handled her food and laundry. She was taken from her ward to a surgical ward for treatment and from the surgical to the non-surgical part of the hospital for a time, and later on returned to a different ward. She was moved several times and there is in evidence a large plat showing the exact places in the institution where she was from time to time. Her symptoms did not become such as to permit a diagnosis of typhoid to be made until two or three weeks after her admission and

she died of that disease on August 30, 1939. Without detailing the testimony, it is sufficient to state that the first twenty-six cases of typhoid were medically directly traceable to this woman and that it is also true, from a medical standpoint, that all of the cases might be accounted for by either direct or indirect exposure to her and to those whom she infected.

The defendant offered the expert testimony of Dr. L. Loyd Arnold, who testified without compensation and whose testimony is in no manner impaired or impeached. In addition to the usual medical degrees, this witness had studied four years in Europe at the University of London, University of Oxford, at the Institute of Tropical Medicine in Hamburg, Germany, at the University of Goettingen, at the University of Munich and the University of Tuebingen. His experience included service as biochemist at the Barnes Hospital in St. Louis, as pathologist at Nashville City Hospital and other such employments. At the time of his testimony, he was professor of Bacteriology and Public Health at the College of Medicine at the University of Illinois, Professor of Bacteriology in the College of Dentistry at the University of Illinois, and also in the College of Pharmacy of that institution. He had previously served as professor of Pathology, Bacteriology and Public Health for five years at Loyola University, School of Medicine, and as director of laboratories for seven large Chicago hospitals. For eleven years he served as bacteriologist in the Illinois Department of Public Health, in charge of its Chicago laboratory and was also, at the time of his testimony, a member of the Chicago Board of Health. During all of his experience, he had specialized in public health matters and epidemics. His experience with the latter included several studies in the field in the examination of actual epidemics which had occurred in various places. This witness considered, analyzed and explained the various charts above referred to, which had been made by Dr. Eberhard and as

to which Dr. Eberhard had expressed no opinion. It is the opinion of this witness that Mary Ores was suffering from a latent and not yet developed typhoid when she entered and while she was in the hospital, and that the epidemic was traceable to her. His reasons for this opinion are not only reasonable, but clear and convincing. He was quite positive that this was not a water-borne epidemic and we think the record proves this to be the fact.

It would unnecessarily prolong this opinion to make any further or more detailed analysis of the testimony of the great number of witnesses who were called. From what we have already said it is fully apparent that the People failed to prove the defendant guilty and that no guilt could even be assumed, unless at the same time many facts not proved by the record were also assumed. It was not proved, and we cannot assume that any typhoid *bacillus* was ever found in the drinking water. It was not proved and we cannot assume that there was ever any leak or defect in the system of plumbing and sewage disposal, or that any such contamination entered either of the wells. In the face of the testimony of Dr. Arnold, it would be extremely presumptuous for any layman to assume that the infection came from any other place than the body of Mary Ores. On the other hand, we think the evidence clearly and satisfactorily establishes that the infection did come from that person and that the record, fully considered and properly construed, shows nothing at all to indicate any guilt on the part of this defendant.

In view of our opinion of this matter, it is unnecessary to consider any other errors assigned and it is not necessary to remand the cause for any further proceedings.

The judgment is reversed. *Judgment reversed.*